DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JASON KLEINWAKS (NYBN 5335013 / DCBN 1049058)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6924
    FAX: (415) 436-7234
    jason.kleinwaks@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>JAIME AVINA BARAJAS,<br><br>    Defendant. | CASE NO. CR 19-0562 WHO<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**<br><br>Court:        Courtroom 2, 17th Floor<br>Hearing Date:  January 7, 2021<br>Hearing Time: 1:30 p.m. |

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ..................................................................................2

      A.    Defendant's Mother Requests Police Assistance, Indicating That He May
            Have Taken Pills and That She Was Concerned That He May Harm Himself
            or Another. ...................................................................................................2

      B.    Several Hours Later, Defendant's Brother Requests Police Assistance With
            Defendant's Violent Behavior. .....................................................................4

      C.    EPAPD Officers Briefly Place Defendant Under Citizen's Arrest.................5

      D.    Defendant is Charged with the Instant Offenses............................................7

III.  ARGUMENT ..........................................................................................................8

      A.    The Officers' Entry Into the Apartment Was Proper Under the Emergency Aid
            Exception. .....................................................................................................8

      B.    Defendant's Arrest Did Not Violate His Fourth Amendment Right. ............14

      C.    The Government Does Not Object to the Limited Exclusion of the March 5,
            2019 Statements Made By Defendant While Under Arrest From Its Case-In-
            Chief.............................................................................................................19

IV.   CONCLUSION......................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barry v. Fowler*,
902 F.2d 770 (9th Cir. 1990) ................................................................. 16

*Brigham City*,
547 U.S. ................................................................................................ 8, 11

*Davis v. United States*,
564 U.S. 229 (2011) ................................................................................. 13

*Devenpeck v. Alford*,
543 U.S. 146 (2004) ................................................................................. 14

*Fletcher v. Clinton*,
196 F.3d 41 (1st Cir. 1999) ...................................................................... 10

*Florida v. Royer*,
460 U.S. 491 (1983) ................................................................................. 14

*Herring v. United States*,
555 U.S. 135 (2009) ................................................................................. 13

*Mattus v. United States*,
11 F.2d 503 (9th Cir. 1926) ..................................................................... 19

*Michigan v. Fisher*,
558 U.S. 45 (2009) ............................................................................... 8, 11

*Mincey v. Arizona*,
437 U.S. 385 (1978) ................................................................................. 12

*Padilla v. Meese*,
184 Cal. App. 3d 1022, 229 Cal. Rptr. 310 (Ct. App. 1986) ............... 16, 18

*Pollard v. Galaza*,
290 F.3d 1030 (9th Cir. 2002) .............................................................. 19, 20

*Sandoval v. Las Vegas Metro. Police Dep't*,
756 F.3d 1154 (9th Cir. 2014) ................................................................... 9

*Surdyka*,
492 F.2d 368 (4th Cir. 1974) .................................................................... 16

*Tierney v. Davidson*,
133 F.3d 189 (2d Cir. 1998) ..................................................................... 10

*United States v. Arvizu*,
534 U.S. 266 (2002) ................................................................................. 12

*United States v. Becerra-Garcia,*
   397 F.3d 1167 (9th Cir. 2005) ........................................................................ 16

*United States v. Black,*
   482 F.3d 1035 (9th Cir. 2007) ........................................................................ 11

*United States v. Brooks,*
   367 F.3d 1128 (2004) ......................................................................... 11, 12, 13

*United States v. Brown,*
   64 F.3d 1083 (7th Cir.1995) ........................................................................... 11

*United States v. Cervantes*,
   219 F.3d 882 (9th Cir. 2000) ............................................................................. 8

*United States v. Cook,*
   808 F.3d 1195 (9th Cir. 2015) ........................................................................ 19

*United States v. Cunningham,*
   133 F.3d 1070 (8th Cir.1998) ......................................................................... 13

*United States v. Lopez,*
   482 F.3d 1067 (9th Cir. 2007) .................................................................. 14, 15

*United States v. Mariscal*,
   285 F.3d 1127 (9th Cir. 2002) ........................................................................ 15

*United States v. Martinez*,
   406 F.3d 1160 (9th Cir. 2005) ........................................................................ 10

*United States v. Ramirez*,
   473 F.3d 1026 (9th Cir. 2007) ........................................................................ 14

*United States v. Richardson,*
   208 F.3d 626 (7th Cir.2000) ........................................................................... 13

*United States v. Snipe,*
   515 F.3d 947 (9th Cir. 2008) ............................................................. 8, 9, 10, 11

*United States v. Tiong,*
   224 F.3d 1136 (9th Cir. 2000) ........................................................................ 12

*United States v. Wallace,*
   213 F.3d 1216 (9th Cir. 2000) ........................................................................ 15

*Vernonia Sch. Dist. 47J v. Acton,*
   515 U.S. 646 (1995) ........................................................................................ 12

*Virginia v. Moore,*
   553 U.S. 164 (2008) ........................................................................................ 16

GOV. OPP'N TO MOT. TO SUPPRESS
CR 19-0562 WHO

**Statutes**

18 U.S.C. § 922(o) ............................................................................................................. 1, 7

26 U.S.C. § 5861 ............................................................................................................... 1, 7

Cal. Penal Code § 837......................................................................................................... 16

Cal. Penal Code § 594.................................................................................... 1, 14, 15, 16, 19

California Penal Code § 836 ............................................................................................... 14

# I.    INTRODUCTION

Defendant Jaime Avina Barajas seeks suppression of certain evidence in his prosecution for violating 18 U.S.C. § 922(o), Possession of a Machinegun, and 26 U.S.C. §§ 5861(d) and (2), Possession of Unregistered Firearm.  In advancing his motion to suppress, he asserts that the entry by officers into his residence and his subsequent arrest and search were unconstitutional under the Fourth Amendment, and as a result, the evidence found on his person should be excluded.  However, as explained herein, Defendant's motion to suppress this evidence should be denied.

The officers' entry into Defendant's residence falls squarely within the emergency aid exception to the Fourth Amendment's warrant requirement.  In the hours leading up to the entry to Defendant's residence, Defendant's own family members had reported: that he was a potential danger to himself or another; that they could not control him; that he had taken a large quantity of pills; that he was acting crazy because of relationship issues with his girlfriend; and that he was acting violently and breaking things in the apartment.  Officers responding to the call immediately preceding the arrest were informed by dispatch that Defendant may have taken twenty Xanax pills, was breaking things in the home, including a TV, and that two females were present in the apartment with him.  Entry into the residence to ensure that no one needed immediate assistance was reasonable in this type of situation, where officers were confronting a potentially violent domestic disturbance, and was consistent with the emergency aid exception.

The officers' arrest and search of Defendant was also permissible under the Fourth Amendment. The officers had probable cause to arrest Defendant for both felony or misdemeanor vandalism under California Penal Code § 594 for breaking his father's TV.  The officers additionally received authorization from Defendant's father to place Defendant under citizen's arrest for the damage to the TV.  Because each of these bases for arrest were proper, the search incident to that arrest was similarly proper.

Separately, Defendant also seeks suppression of statements he made in response to two questions asked by an officer during his arrest.  The government does not object to exclusion of these limited statements from its case-in-chief.

## II. FACTUAL BACKGROUND

### A. Defendant's Mother Requests Police Assistance, Indicating That He May Have Taken Pills and That She Was Concerned That He May Harm Himself or Another.

On March 5, 2019, at approximately 1702 hours, Defendant's mother placed a call requesting police assistance with the Defendant. *See* Declaration of Jason Kleinwaks ("Kleinwaks Decl."), Ex. A (March 5, 2019 Call Translation) at 211.[1] When asked what was wrong with the Defendant, she replied "I don't know what's wrong, but there's something really wrong." *Id.* Dispatch asked her whether Defendant "needed medical attention or just the police," and she confirmed that she was requesting the police. *Id.* Defendant's mother explained that Defendant's girlfriend told her Defendant had taken some pills. *Id.* at 212.

Dispatch asked if Defendant's mother was afraid he was going to do something to himself or another person. *Id.* at 213. Defendant's mother replied "Himself or another person. I don't know. It's just that there's something wrong with him." *Id.* She further stated that "I am not able to control him. I don't have anyone that can help me." *Id.* Dispatch pressed further, asking if Defendant told her that he wanted to hurt himself. Defendant's mother confirmed "Yes, he told [his girlfriend] that he wanted to hurt himself. He wanted to take the pills because he wanted to die." *Id.* Defendant's mother further indicated that Defendant's behavior was because his girlfriend no longer wanted to live with him in the house. *Id.*

Defendant's mother stated that Defendant had left the house and that she did not know what direction he went. *Id.* at 213. She explained that Defendant took his girlfriend's phone with him, and that his girlfriend had gone after him. *Id.* at 213-14. She stated that she was "afraid he's going to do something to [his girlfriend] because he's not well." *Id.* at 214. Moreover, her husband was at work and she did not "have anyone to control him." *Id.* Defendant's mother provided Defendant's phone number to the responder, who indicated the police were on their way and would try to contact Defendant. *Id.* at 215.

---

[1] For ease of reference, the last two or three digits of the Bates numbers will be used to identify pages of exhibits.

In light of the call from Defendant's mother, dispatch relayed that a welfare check was requested for Defendant who had left the house, noting that his mother believed he was under the influence. Kleinwaks Decl., Ex. B (Condensed Radio Recording – 1702 Incident) (0:21)[2]. Over the next few minutes, dispatch informed officers that Defendant's mother believed he might harm himself or someone else, *id.* (1:15), and that he had told his girlfriend he wanted to take large amounts of pills and kill himself, *id.* (1:58); Kleinwaks Decl., Ex. C (CAD Report – 1702 Incident) at 197. Officer Wong of the East Palo Alto Police Department ("EPAPD") responded to Defendant's residence and made contact with Defendant's mother, who confirmed that Defendant had just broken up with his girlfriend and believed that was why he was acting this way. *See* Kleinwaks Decl. Ex. D (EPAPD Incident Reports) at 181.

At approximately 1706 hours, a member of the police department attempted to contact Defendant using the phone number that Defendant's mother had provided. When the caller identified himself, Defendant angrily stated "fuck you and fuck the police department, bitch" before disconnecting. Kleinwaks Decl., Ex. E (Barajas Call #1) (0:35). One minute later, at 1707 hours, Defendant responded to another call by stating that he did not want "to talk to no pigs" and again hung up the phone. Kleinwaks Decl., Ex. F (Barajas Call #2). At 1708 hours, an officer radioed that Defendant was being somewhat verbally abusive over the phone. Kleinwaks Decl., Ex. B (2:30); *see also* Kleinwaks Decl., Ex. C at 197 ("JAIME ANSWERED THE PHONE - - - CURSED AND DISCONNECTED"). Two more calls were placed to Defendant, but both were met with more hostility and vulgarities. *See* Kleinwaks Decl., Ex. G (Barajas Call #3); Kleinwaks Decl., Ex. H (Barajas Call #4). Defendant answered one call by saying "what the fuck do you want," and refused to reveal where he was, despite the caller telling him that they were just trying to make sure he was okay. Kleinwaks Decl., Ex. H.

At approximately 1713 hours, dispatch called Defendant's mother to provide an update. Kleinwaks Decl., Ex. A at 224. Dispatch informed her that Defendant was answering his phone but was "being aggressive and acting rudely." *Id.* Defendant's mother told dispatch that Defendant's girlfriend will not answer her phone because Defendant took it. *Id.* at 224-25. Defendant's mother also informed

---

[2] Parenthetical time notations refer to the time in the pertinent audio recording.

the dispatcher that a female friend of Defendant's—Maria—had taken his car keys from him, and that Defendant was now texting Maria with his girlfriend's phone. *Id.* at 224-25. Defendant's mother believed that Defendant may be heading to Maria's residence to get his keys back. *Id.* This information was relayed to officers in the field. *See* Kleinwaks Decl., Ex. C at 197.

Eventually, Defendant was added to the missing persons system. *See* Kleinwaks Decl., Ex. D at 181; Ex. C at 198. The entry contained information about Defendant's recent breakup and that he may have taken unknown pills. Kleinwaks Decl., Ex. C at 198-99. At approximately 1745 hours, a radio caller asked whether Defendant was "at risk," and another responded that he would say "no for now." Kleinwaks Decl., Ex. B (9:30). However, additional context was provided, including that Defendant had no documented mental health risk and was not on any medications. *Id.* (10:11). The radio caller warned that Defendant is anti-police department based on his response to calls with officers. *Id.* (10:11, 11:35); Kleinwaks Decl., Ex. C at 199 ("MISSING PERSON IS ANTI LAW PD").

### B. Several Hours Later, Defendant's Brother Requests Police Assistance With Defendant's Violent Behavior.

Only a few hours after Defendant's mother initially placed a call for police assistance, Defendant's brother similarly requested police assistance to the family residence at 2136 hours. Kleinwaks Decl., Ex. I (March 5, 2019 Call – 2136). Defendant's brother told dispatch that Defendant had taken pills and was acting "really crazy." *Id.* (0:11). He elaborated that Defendant was at the family home, was "breaking a bunch of things," and was being "very violent." *Id.* (0:17). Defendant's brother informed dispatch that Defendant told him he had taken around 20 pills, which the brother thought were Xanax. *Id.* (1:58). Defendant's brother also told dispatch that Defendant's girlfriend broke up with him the prior night and he was "going crazy." *Id.* (3:45). Defendant had reportedly called his girlfriend a bunch of names and was "pushing her around" the previous evening. *Id.* (4:00).

Defendant's brother stated that he had left the home because Defendant was being "too violent for us" and "throwing a bunch of things all over the place." *Id.* (0:52). He informed dispatch that there were two women still at the home who had texted him and told him that they could not control Defendant. *Id.* (1:20). He also told dispatch that the two women had called crying, reporting that Defendant had broken the TV, was throwing things around, and was threatening to keep breaking things

unless the women gave him his car keys. *Id.* (3:00). Defendant's brother indicated that the women had called him only four or five minutes ago. *Id.* (3:25).

Defendant's brother told dispatch that one of the women at the apartment with Defendant was named Maria and he provided her phone number. *Id.* (4:13). At 2141 hours, dispatch attempted to contact Maria to determine if she needed assistance. Kleinwaks Decl., Ex. J (Call to Maria). A woman answered the phone, confirming that she was Maria. *Id.* However, Maria then indicated that she did not know Defendant's brother and stated she did not live in East Palo Alto. *Id.* Dispatch initially thought she had the wrong number and, at 2143 hours, called Defendant's brother back to report the error. Kleinwaks Decl., Ex. K (Call to Defendant's Brother). Defendant's brother explained that he had provided the number that Maria had used to call him. *Id.* (0:30). He asserted that Maria was "probably just covering" for Defendant and that she sounded "really scared" when she had called him. *Id.* (0:40). He also said that he could try texting Maria, but he did not know if she would answer after the call with dispatch. *Id.* (1:15).

As these events were unfolding, dispatch was relaying the critical information that Defendant's brother had provided to the officers in the field who were responding to the call. At 2137 hours, dispatch informed officers that Defendant's brother reported that he had taken pills and was "now breaking things in the home." Kleinwaks Decl., Ex. L (Condensed Radio – 2136 Call) (0:09). At 2139 hours, Defendant was identified as the individual involved in the earlier incident. *Id.* (0:42). At 2141 hours, dispatch indicated that Defendant's brother thought Defendant "took about twenty pills, thinks they were Xanax." *Id.* (1:06). Dispatch also conveyed that Defendant was with two females ("Xs") in the apartment, *id.* (1:19), but that he had left and was not sure whether Defendant was still there, *id.* (1:21). Dispatch further advised that Defendant's brother had spoken with Maria, who was at the apartment with Defendant, only five minutes ago and she reported that Defendant had broken the TV. *Id.* (1:40). At 2151 hours, dispatch told officers that the two females with Defendant should be Marianna and Maria. *Id.* (4:31).

## C. EPAPD Officers Briefly Place Defendant Under Citizen's Arrest.

With this information from dispatch in hand, Sergeant Sanchez, Officer Norris, and Officer Kalb of the EPAPD responded to the call from Defendant's brother. Declaration of Sergeant Angel Sanchez

("Sanchez Decl.") ¶ 6. After arriving on scene, the officers approached the reported apartment and knocked on the door. *Id.* ¶ 7; Kleinwaks Decl., Ex. D at 184. Defendant answered the door, opening it only partially. Sanchez Decl. ¶ 7. He appeared agitated that the officers were present, and the officers asked to enter to apartment to determine whether Defendant or any occupants needed emergency assistance. Kleinwaks Decl., Ex. D at 184; *see* Sanchez Decl. ¶ 7. Neither of the two females who were reportedly present inside the apartment were visible. Sanchez Decl. ¶ 7. Defendant quickly tried to shut the door on the officers, but Officer Norris prevented the door from closing with his hand. Kleinwaks Decl., Ex. D at 184; Sanchez Decl. ¶ 8. Because the officers had received information about Defendant's destructive behavior, his consumption of a large quantity of Xanax, and the presence of additional female occupants who had not yet been located, the officers entered the apartment to ensure that neither Defendant nor any occupants were in danger or needed assistance. Sanchez Decl. ¶ 8.

Once inside the apartment, the officers saw that a flat screen TV, approximately 40 to 50 inches in size, was laying broken on the ground in the living room area of the home. Sanchez Decl. ¶ 10; Kleinwaks Decl., Ex. D at 184. The officers also encountered a female (Defendant's declarant, Maria Guzman), who identified herself as his sister. Kleinwaks Decl., Ex. D at 184; Sanchez Decl. ¶ 9. The officers spoke with Defendant inside the home and explained the details they had received about his behavior, and additionally evaluated him for a 5150 mental health hold. Sanchez Decl. ¶ 9; Kleinwaks Decl., Ex. D at 184. Defendant admitted to breaking the flat screen TV, but claimed that the TV belonged to him. Sanchez Decl. ¶ 10; Kleinwaks Decl., Ex. D at 184. Defendant also told officers that he had not taken pills. Sanchez Decl. ¶ 10; Kleinwaks Decl., Ex. D at 184.

Sergeant Sanchez then spoke with Defendant's father by phone and relayed that Defendant did not appear to have taken any pills and did not meet the criteria for a 5150 hold. Sanchez Decl. ¶ 11; Kleinwaks Decl., Ex. D at 184. He also explained the damage Defendant had done to the TV, and Defendant's father confirmed that the TV belonged to him, not to Defendant. Sanchez Decl. ¶ 11; Kleinwaks Decl., Ex. D at 184. Because Defendant's father was concerned that Defendant would damage additional property after the officers left the residence, Sergeant Sanchez explained that Defendant's father could effectuate a citizen's arrest for the damage to the TV. Sanchez Decl. ¶ 11. Defendant's father agreed, and the officers placed Defendant under citizen's arrest for vandalism.

Sanchez Decl. ¶ 11; Kleinwaks Decl., Ex. D at 184.

Sergeant Sanchez handcuffed Defendant and escorted him to a patrol vehicle, passing off the phone to Officer Norris. Sanchez Decl. ¶ 12; Kleinwaks Decl., Ex. D at 184. Sergeant Sanchez then searched Defendant, finding ammunition and what would later be identified as a Glock conversion device[3] or "Glock switch" in his pocket. Sanchez Decl. ¶ 12; Kleinwaks Decl., Ex. D at 184. Sergeant Sanchez asked Defendant why he had ammunition. Because Sergeant Sanchez recognized the Glock switch as a firearm component but did not know its function, he also asked Defendant about the device. Sanchez Decl. ¶ 12; Kleinwaks Decl., Ex. D at 184. Sergeant Sanchez does not recall whether he provided *Miranda* warnings at that time. Sanchez Decl. ¶ 12.

Shortly after the search, Officer Norris, who had been speaking with Defendant's father on the phone, informed Sergeant Sanchez that Defendant's father had changed his mind about the citizen's arrest and no longer wanted to press charges. As a result, the officers released Defendant. Sanchez Decl. ¶ 13; Kleinwaks Decl., Ex. D at 184. The ammunition and Glock switch located during the search were booked into evidence. Kleinwaks Decl., Ex. N (Report of Det. Weigand) at 28.

On June 4, 2019, EPAPD Detective Weigand visited Defendant at the San Francisco County Jail after learning that Defendant had been arrested in San Francisco in possession of a firearm. Kleinwaks Decl., Ex. N at 30. Defendant was read his *Miranda* rights from a *Miranda* warning form, and agreed to speak with Det. Weigand. *Id.* Barajas proceeded to make a recorded statement about the Glock switch. *Id.*

**D.    Defendant is Charged with the Instant Offenses**

On October 24, 2019, Defendant was charged in a two count Indictment with violating 18 U.S.C. § 922(o), Possession of a Machinegun, and 26 U.S.C. §§ 5861(d) and (2), Possession of Unregistered Firearm. Defendant's initial appearance was held on May 14, 2020. Defendant filed the instant motion to suppress on October 15, 2020. A hearing on the motion is presently set for January 7, 2021.

---

[3] A device designed and intended to convert a semiautomatic, Glock-type pistol into a machinegun.

## III. ARGUMENT

### A. The Officers' Entry Into the Apartment Was Proper Under the Emergency Aid Exception.

The officers' entry into Defendant's apartment was justified under the emergency aid exception to warrantless entries—a rationale that is critical to officers' performance of their duties to the public—and therefore is consistent with the Fourth Amendment. Under the emergency aid exception, officers may enter a residence without a warrant "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009). This justification does not derive from "police officers' function as criminal investigators, but [rather] their community caretaking function to respond to emergency situations." *United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir. 2000) abrogated on other grounds by *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006). Because the information available to the responding officers indicated that the defendant was acting violently, had taken a large quantity of Xanax pills, and that additional female occupants may be present in the apartment during this behavior, the officers were permitted to enter the apartment in order to ensure that neither Defendant nor anyone else was in danger or required assistance.

The emergency aid exception applies when "(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). When satisfied, "if law enforcement, while 'respond[ing] to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would be found.'" *Id.*

Application of the emergency aid exception "does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises," but "requires only an objectively reasonable basis for believing that a person within [the residence] is in need of immediate aid." *Fisher*, 558 U.S. at 47 (citations and internal quotation marks omitted). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively,* justify [the] action.'" *Brigham City*, 547 U.S. at 404–05. Accordingly, officers' actions are assessed "from the perspective of a reasonable officer on the scene,

1    rather than with the 20/20 vision of hindsight." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d

2    1154, 1163 (9th Cir. 2014).  Moreover, courts have "eschewed bright-line rules, instead emphasizing the

3    fact-specific nature of the reasonableness inquiry, and looked to the totality of the circumstances."

4    *Snipe*, 515 F.3d at 953.

5            The facts justifying entry into the apartment are borne out in call recordings and transcripts,

6    CAD reports, and radio broadcast recordings.  Defendant's own mother had explained her concerns that

7    Defendant might harm himself or his girlfriend, including that Defendant had indicated that he might be

8    suicidal.  Kleinwaks Decl., Ex. A at 211-15.  This information was relayed by dispatch to officers in the

9    field and may have also been passed on to officers coming on duty.  Sanchez Decl. ¶ 4; Kleinwaks

10   Decl., Exs. B, C.  This was followed by yet another call only a few hours later from Defendant's brother

11   reporting that Defendant had told him he had taken around 20 Xanax pills, was acting "really crazy,"

12   "breaking a bunch of things," including a TV, and was being "very violent."  Kleinwaks Decl., Ex. I

13   (0:11), (1:58), (3:00).  Defendant's brother further told dispatch that two females were present at the

14   residence and had indicated that they were crying and scared.  *Id.* (3:00).  Defendant's brother also

15   indicated that Defendant had called his girlfriend a bunch of names and was "pushing her around" the

16   previous evening.  *Id.* (4:00).

17          Dispatch relayed the most critical information received from Defendant's brother to the officers

18   responding to the call, including that Defendant may have taken a large quantity of Xanax, Kleinwaks

19   Decl., Ex. L (1:06), was breaking things in the apartment,  *id.* (0:09), including a TV, *id.* (1:40), and that

20   there were potentially two females in the residence with Defendant, *id.* (1:19), (4:31).  Moreover,

21   dispatch relayed that the reporting party had spoken with one of the women as recently as five minutes

22   ago.  *Id.* (1:40).  Based on this information, a reasonable officer responding would have every reason to

23   believe that they were approaching a potentially violent domestic disturbance, which alone justified

24   entry to ensure the occupants did not need immediate assistance.  *See United States v. Brooks,* 367 F.3d

25   1128, 1136 (2004) (observing that "[t]wo other circuits have even held that a 911 call reporting a

26   domestic emergency, without more, may be enough to support a warrantless search of a home" (citing

27   *United States v. Richardson,* 208 F.3d 626, 630 (7th Cir.2000); *United States v. Cunningham,* 133 F.3d

28   1070, 1072–73 (8th Cir.1998)).

Even so, when the officers arrived with this information in hand, Defendant "appeared agitated the police were at his apartment." Kleinwaks Decl., Ex. D at 184; Sanchez Decl. ¶ 7. Defendant opened the door only partially, Sanchez Decl. ¶ 7, and Defendant admits he was positioned to "block[] their view of the interior of the apartment," Mot. 3. Defendant also, "[a]fter a few seconds, . . . attempted to close the door" on the officers. *Id.*; Sanchez Decl. ¶ 7; Kleinwaks Decl., Ex. D at 184. The officers could not determine whether the reported female occupants were safe from outside the apartment in the short period before Defendant attempted to shut them out, nor could they determine whether Defendant himself needed medical assistance or should be placed on a 5150 mental health hold. *See* Sanchez Decl. ¶¶ 7, 8.

In addition to these facts, the nature of the call itself justified entry to the residence. The emergency aid exception is particularly applicable where, like here, the officers were responding to a report by Defendant's own brother that Defendant was acting "really crazy," "breaking a bunch of things," being "very violent"—a prime example of a violent domestic disturbance. Kleinwaks Decl., Ex. I (0:11). In fact, Defendant's father states that the officers told him they were present for a "domestic violence" issue. Declaration of Jose Avina ("Avina Decl."), Dkt. 34-1, ¶ 4. The Ninth Circuit has observed that "the volatility of situations involving domestic violence make them particularly well-suited for an application of the emergency doctrine. When officers respond to a domestic abuse call, they understand that 'violence may be lurking and explode with little warning.'" *United States v. Martinez*, 406 F.3d 1160, 1164–65 (9th Cir. 2005) (quoting *Fletcher v. Clinton,* 196 F.3d 41, 50 (1st Cir. 1999)). This is because "more officers are killed or injured on domestic violence calls than on any other type of call." *Id.* (citing *Hearings before Senate Judiciary Committee,* 1994 WL 530624 (F.D.C.H.) (Sept. 13, 1994) (statement on behalf of National Task Force on Domestic Violence)).[4] Other circuits have similarly determined that these types of situations create a need for the officer to enter the home where it appears that the occupant might hurt himself or others, and the Second Circuit has observed that "[c]ourts have recognized the combustible nature of domestic

---

[4] Defendant points out that officers were provided information indicating there were no weapons in the home. That hardly means that an officer will not be confronted with a weapon at the scene, whether it be an unknown firearm or kitchen knife found in every residence. To expect otherwise could be fatal, especially when approaching a call of this nature.

disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." *Id.* (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir. 1998)). Accordingly, "the exigencies of domestic abuse cases present dangers that, in an appropriate case, may override considerations of privacy." *United States v. Black*, 482 F.3d 1035, 1040 (9th Cir. 2007) (citing *United States v. Brooks,* 367 F.3d 1128, 1136 (2004)).

Given the nature of such incidents and the information at hand, the officers had an objectively reasonable basis for believing that either Defendant or one of the occupants in the residence may be in need of immediate aid. Indeed, "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 49. The officers need not "witness ongoing violence before responding to an emergency," and such a requirement would be inconsistent with *Brigham City*'s express statement that police officers do *not* have to wait for violence before acting. *Snipe*, 515 F.3d at 952 (citing *Brigham City*, 126 S. Ct. at 1949 ("The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.")); *see also United States v. Brown,* 64 F.3d 1083, 1086 (7th Cir.1995) ("We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams.").

The same facts and circumstances compel the conclusion that the officers' entry was reasonable to meet the need that they confronted. The officers were confronting a situation where Defendant was reportedly acting violently, had taken a large quantity of Xanax pills, and there were other occupants in the apartment. When Defendant answered the door, he appeared agitated, only opened the door partially, and blocked the officers' view of the interior of the apartment. Officers had been informed that there may be two females in the apartment, and they had not seen either. Defendant then tried to close the door before the officers had determined the safety of everyone involved. "It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here. Only when an apparent threat has become an actual harm can officers rule out innocuous explanations for ominous circumstances. But '[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.'"

*Fisher*, 558 U.S. at 49.

Ms. Guzman claims in her declaration that Defendant had "calmed down and was composed" at the time officers arrived, but this assertion is belied by all of the events over the preceding several hours. Declaration of Maria Guzman ("Guzman Decl."), Dkt. 34-2, ¶ 3.[5]  For example, Defendant's brother told dispatch that he had spoken with Maria (Ms. Guzman) only five minutes ago and she had reported that Defendant had broken a TV and was threatening to continue breaking things.  Kleinwaks Decl., Ex. I (3:00).  It is also inconsistent with Defendant's attempt to close the door on the officers "[a]fter a few seconds."  Mot. 3; Sanchez Decl. ¶ 7; Kleinwaks Decl., Ex. D at 184.  Even if this were accurate, however, the officers would not have been required to remain outside the residence where they were not adequately able to assess the danger to Defendant or the two women who were reportedly present with Defendant.  The Supreme Court has "repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment."  *Brooks*, 367 F.3d at 1135–36 (citing *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 663 (1995)).  Moreover, even if the officers had seen Ms. Guzman at the door—a claim not made in Defendant's motion and belied by Sergeant Sanchez's statement, Sanchez Decl. ¶ 7—her visibility would not diminish the officers' need to enter.  The officers were informed there were two females in the apartment, not one, and "[c]onsidering the tendency of victims of domestic abuse to be less than forthcoming about the harms to which they were or will likely be exposed at the hands of an aggressor who remains on the scene," the officers would still be "entitled to search inside the [apartment], which in the total circumstances was an objectively reasonable way to address the exigency."  *Brooks*, 367 F.3d at 1136 (citing *Mincey v. Arizona,* 437 U.S. 385, 394 (1978)).  The officers could reasonably conclude that, given the information provided, Ms. Guzman may be less than forthcoming about any danger while positioned next to the source of that danger.  The Fourth Amendment does not require an officer to rule out the possibility of innocent conduct *before* conducting an investigation. *United States v. Arvizu*, 534 U.S. 266, 277 (2002); *United States v. Tiong*, 224 F.3d 1136, 1140–41 (9th Cir. 2000).

The Ninth Circuit decision in *United States v. Brooks* illustrates the reasonableness of the

---

[5] The reliability of Ms. Guzman's declaration is addressed in additional detail below.

officers' entry.  There, an officer responded to a 911 call reporting possible domestic violence in a hotel room.  *Brooks*, 367 F.3d at 1130.  The officer knocked on the hotel room door and asked to speak to the woman inside, who the defendant had indicated was in the bathroom.  *Id.*  The officer then entered the hotel room without consent.  *Id.*  The Ninth Circuit rejected the defendant's argument that "rather than enter the hotel room without consent, [the officer] could have asked [the woman] to join him in the hallway so that he might there assess the safety risks involved," finding that remaining outside was not constitutionally required.  *Id.* at 1135-36.  It also observed that "[a] hallway interview would not necessarily have been effective to protect [the woman] in this context because it would not have addressed sufficiently the exigency with which [the officer] was confronted."  *Id.* at 1136.  Applied to the case at hand, entering the apartment to further assess the safety of Defendant and any occupants was a reasonable decision, especially where the option for further discussion was foreclosed by Defendant's attempt to shut the door on the officers.  *See* Mot. 3; Kleinwaks Decl., Ex. D at 184; Sanchez Decl. ¶ 8.  Because the officers had an objectively reasonable basis for the believing that either Defendant or one of the other occupants of the apartment may need immediate assistance, and their entry into the apartment was reasonable under the circumstances, Defendant's Fourth Amendment rights were not violated by that entry, and suppression is not appropriate on this ground.

Even if the facts did not support application of the emergency aid exception, suppression would nonetheless be inappropriate.  The Supreme Court has repeatedly held that the exclusion of incriminating evidence following a Fourth Amendment violation is inappropriate if the officer was acting in good faith at the time of the search or seizure.  The Court has explained that "suppression is not an automatic consequence of a Fourth Amendment violation," but that it is instead a separate inquiry that "turns on the culpability of the police and the potential of exclusion to deter wrongful police misconduct."  *Herring v. United States*, 555 U.S. 135, 137 (2009).  This is in part because "[e]xclusion exacts a heavy toll on both the judicial system and society at large" by requiring "courts to ignore reliable, trustworthy evidence bearing on guilt or innocence."  *Davis v. United States*, 564 U.S. 229, 237 (2011).  Here, the officers were acting in good faith based on the information they had received about Defendant's violent behavior and the possibility that Defendant or other occupants may need immediate assistance.  This is not the type of police conduct that should be deterred.

**B.     Defendant's Arrest Did Not Violate His Fourth Amendment Right.**

Defendant was placed under citizen's arrest after Sergeant Sanchez obtained authorization from Defendant's father, but Defendant's father and Ms. Guzman now claim that the arrest was not authorized. While this citizen's arrest was proper, the Court need not even reach the question of whether Defendant's father did in fact authorize the arrest because they had probable cause to arrest Defendant for either felony or misdemeanor vandalism under California Penal Code § 594.

At the outset, it is irrelevant that the officers asserted a citizen's arrest at the authorization of Defendant's father as the basis for Defendant's arrest. Supreme Court case law "make[s] clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause," and the officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *United States v. Ramirez*, 473 F.3d 1026, 1030–31 (9th Cir. 2007). Accordingly, the officers' asserted rationale or basis for an arrest or seizure does not foreclose the government from later justifying that arrest or seizure by proving probable cause. *See Ramirez*, 473 F.3d at 1031; *Florida v. Royer,* 460 U.S. 491, 507 (1983) ("the fact that the officers did not believe there was probable cause and proceeded on a consensual or Terry-stop rationale would not foreclose the State from justifying Royer's custody by proving probable cause"). Moreover, the existence of probable cause is not contingent upon whether or not Defendant's father authorized a citizen's arrest and therefore renders the potential factual dispute immaterial.

Here, the officers had probable cause to arrest Defendant for felony vandalism under California Penal Code § 594. California Penal Code § 836(a)(3) authorizes officers to make arrests when the officer "has probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed." In this inquiry, "[p]robable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). "Alternatively, [the Ninth Circuit] has defined probable cause as follows: when 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had

committed a crime.'" *Id.*

An individual is guilty of felony vandalism under California Penal Code 594(b)(1) when he or she maliciously damages or destroys "any real or personal property not his or her own" and the damage or destruction is four hundred dollars ($400) or more. Here, the officers had probable cause to believe Defendant destroyed a TV exceeding $400 in value that did not belong to him, and accordingly had committed a felony. The officers were informed by dispatch prior to their arrival that the reporting party had advised that Defendant was breaking things in the apartment and specifically had broken the TV. Sanchez Decl. ¶ 6; Kleinwaks Decl., Ex. M. When officers made entry to the apartment, they observed a broken flat screen TV, approximately 40-50 inches in size, laying on the floor. Sanchez Decl. ¶ 10; Kleinwaks Decl., Ex. D at 184. Defendant stated that he had broken the TV, and when the officers spoke to Defendant's father, he confirmed that the TV belonged to him. Sanchez Decl. ¶¶ 10-11; Kleinwaks Decl., Ex. D at 184.

These facts objectively give rise to probable cause to arrest Defendant for felony vandalism. Officers had reliable information indicating that Defendant had maliciously damaged or destroyed property that did not belong to him. Moreover, while Defendant claims otherwise without support, a prudent person would have concluded that there was a fair probability the broken flat screen TV appearing to be 40 to 50 inches in size was worth $400 or more, especially over a year and a half ago in March 2019 and depending on the brand, features, and age. The actual value of the TV is of no moment—only the reasonable conclusions one could draw with the information at hand. Nor does an officer's appreciation of the $400 threshold between a felony and a misdemeanor affect the outcome. "If the facts are sufficient to lead an officer to reasonably believe that there was a violation, that will suffice, even if the officer is not certain about exactly what it takes to constitute a violation." *United States v. Mariscal*, 285 F.3d 1127, 1130 (9th Cir. 2002); *United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir. 2000), *as amended* (July 7, 2000) ("That Leiber had the mistaken impression that all front-window tint is illegal is beside the point. Leiber was not taking the bar exam. The issue is not how well Leiber understood California's window tinting laws, but whether he had objective, probable cause to believe that these windows were, in fact, in violation.").

Even if the officers had lacked probable cause to believe that Defendant's destruction of the TV

rose to the level of a felony offense, they certainly had probable cause to believe that Defendant had committed misdemeanor vandalism under California Penal Code § 594.[6]  While California law authorizes an officer to make a misdemeanor arrest only where the misdemeanor is committed in the officer's presence, that requirement does not render unconstitutional an arrest for a misdemeanor committed outside an officer's presence.  *See Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990) ("The requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment."); *United States v. Becerra-Garcia*, 397 F.3d 1167, 1173 (9th Cir. 2005) (noting the "well-established proposition that an arrest in violation of state law may still be constitutionally reasonable"); *Street. v. Surdyka*, 492 F.2d 368, 372 (4th Cir. 1974) ("We do not think the fourth amendment should now be interpreted to prohibit warrantless arrests for misdemeanors committed outside an officer's presence. . . . The fourth amendment protects individuals from unfounded arrests by requiring reasonable grounds to believe a crime has been committed. The states are free to impose greater restrictions on arrests, but their citizens do not thereby acquire a greater federal right.").  Because the officers had probable cause to believe that Defendant had committed misdemeanor vandalism, the arrest was constitutionally sound.  *Fowler*, 902 F.2d at 772.  Suppression is not appropriate where "the arrest rules that the officers violated were those of state law alone, and . . . it is not the province of the Fourth Amendment to enforce state law."  *Virginia v. Moore*, 553 U.S. 164, 178 (2008).

Even setting aside the existence of probable cause, Defendant's citizen's arrest was proper. California law permits a citizen's arrest—an arrest by a private citizen of another private citizen—in several specific circumstances.  Cal. Penal Code § 837.  When those circumstances are present, a private citizen may delegate the physical act of taking someone into custody to officers.  *See, e.g.*, *Padilla v. Meese*, 184 Cal. App. 3d 1022, 1030, 229 Cal. Rptr. 310, 315 (Ct. App. 1986) (a citizen "may delegate the act of taking the suspect into physical custody").  Here, Defendant's father was concerned that Defendant would damage more property in the apartment after the officers left and authorized the officers to place Defendant under citizen's arrest for the damage to the TV.  Sanchez Decl. ¶ 11.

---

[6] Defendant even allows that "[a]t most, the officers had reason to believe that Mr. Avina Barajas might have committed misdemeanor vandalism." Mot. 10.

Defendant does not dispute the validity of the citizen's arrest on any ground other than the assertion that his father never authorized the citizen's arrest. Mot. 10-11.

Sergeant Sanchez has confirmed that he spoke with Defendant's father on the phone and that Defendant's father authorized the officers to place Defendant under citizen's arrest for the damage to the TV. Sanchez Decl. ¶ 11; Kleinwaks Decl., Ex. D at 184. Sergeant Sanchez explains that Defendant's father was concerned about Defendant causing additional property damage after the officers left. Sanchez Decl. ¶ 11. This concern is wholly rational and consistent with the call from Defendant's brother reporting Defendant's violent and destructive behavior. Kleinwaks Decl., Ex. I.

Defendant has submitted two declarations in support of the contention that his father did not authorize his citizen's arrest. The first declaration, submitted by Maria Guzman, claims that "Jaime's father told the officer that he did not want to press charges for the television. He did not tell the officer to arrest Jaime." Guzman Decl. ¶ 7. At the outset, Ms. Guzman's declaration omits the entire context of what happened in the hours leading up to Defendant's arrest, including her own apparent role in those events. During the call from around 1702 hours, when Defendant's family was concerned he may harm himself or others, Defendant's mother indicated that Maria (presumably Ms. Guzman) had taken Defendant's car keys from him and that he may be on his way to her house. *See* Kleinwaks Decl., Ex. A at 224-25. Moreover, Defendant's brother indicated that the taking of Defendant's keys was central to the violence unfolding at the apartment during the call at 2137 hours. Kleinwaks Decl., Ex. I. Defendant's brother identified Maria[7] as one of the two women present in the apartment with Defendant while he was acting "very violent," and informed dispatch that she had called him crying only a few minutes earlier to report that Defendant had broken the TV and was now threatening to continue breaking things unless they gave him his car keys. Kleinwaks Decl., Ex. I (3:00). Ms. Guzman's statement ignores all of Defendant's behavior, as well as her own apparent involvement in those events, prior to the officers' arrival on scene.

---

[7] Defendant does not assert, nor does Ms. Guzman indicate, that there was a second Maria present with her and the Defendant at the house, so the only reasonable conclusion is that she is the same Maria that Defendant's brother is referencing in his calls.

Ms. Guzman also consistently downplays Defendant's conduct. For example, she states that "[a]t no time did Jaime present a physical threat to any other person." Guzman Decl. ¶ 2. But Defendant's own brother had requested police assistance because Defendant was acting "really crazy," was "breaking a bunch of things," and was being "very violent." Kleinwaks Decl., Ex. I (0:11). In fact, Defendant's brother stated that he had left the home because Defendant was being "too violent for us" and was "throwing a bunch of things all over the place." Id. (0:52). Ms. Guzman also claims that Defendant had calmed down and was composed when the officers arrived, Guzman Decl. ¶ 2, but Defendant's brother indicated that Maria and the other female present with Defendant had called only five minutes earlier to relay his destructive behavior and threats, Kleinwaks Decl., Ex. I (3:00). The calls from Defendant's family members clearly indicate that his agitated behavior had been ongoing for at least four hours, when his mother first requested police assistance. More than likely, his agitation began as early as the previous night when Defendant's brother indicated that Defendant's girlfriend broke up with him, that Defendant had called his girlfriend a bunch of names, and was "pushing her around." Id. (3:45).

The content of Ms. Guzman's declaration is consistent with Defendant's brother's assertion that, even in the midst of Defendant's violent behavior, she was "probably just covering" for Defendant. Kleinwaks Decl., Ex. K (0:40). It also appears to be consistent with her other actions. When Defendant's brother provided Maria's phone number to the dispatcher to check whether she was alright, the woman answered by confirming she was Maria, but quickly asserted that she did not know Defendant's brother when the dispatcher identified herself. Kleinwaks Decl., Ex. J. Ms. Guzman also reportedly identified herself as Defendant's sister to officers despite no relation. Kleinwaks Decl. Ex. D at 184. Given all of these considerations, Ms. Guzman's declaration lacks sufficient reliability.

The second declaration, submitted by Defendant's father, Jose Avina Mendoza, should similarly be assigned little weight. Like Ms. Guzman, he omits nearly all of the information about Defendant's behavior leading up to the arrest. Moreover, it is difficult to gauge his recollection of this event from over a year and a half ago where he has provided so little detail about those events and there exists no contemporaneous statement for comparison. Additionally, as Defendant's father, he has an inherent interest in the outcome of this motion to suppress, especially where his authorization of a citizen's arrest

for vandalism may have led to a more serious prosecution for possession of a machine gun and an unregistered firearm. The Court need not engage in these assessments of reliability, however, because the officers had independent probable cause to believe Defendant committed felony or misdemeanor vandalism.

In light of the above, Defendant's arrest did not violate his Fourth Amendment rights where the officers had probable cause to arrest him for either a felony or misdemeanor violation of California Penal Code § 594 as well as authorization to effectuate a citizen's arrest. Because the arrest was proper, so was the search of Defendant incident to his arrest and the seizure of property as evidence. *See United States v. Cook*, 808 F.3d 1195, 1199 (9th Cir. 2015) ("A search incident to a lawful arrest is a well-established exception to the Fourth Amendment's warrant requirement."); *Mattus v. United States*, 11 F.2d 503, 504 (9th Cir. 1926) ("Property seized in connection with a lawful arrest and held as evidence of crime is not within the protection of the constitutional provisions relating to searches and seizures.").

### C. The Government Does Not Object to the Limited Exclusion of the March 5, 2019 Statements Made By Defendant While Under Arrest From Its Case-In-Chief.

Defendant moves for exclusion of any statements he made while under arrest on March 5, 2019, asserting that he did not receive *Miranda* warnings at the time. Because Sergeant Sanchez does not recall whether he provided *Miranda* warnings to Defendant at that time, Sanchez Decl. ¶ 12, the government does not object to exclusion of those statements, which are described in the Sergeant Sanchez's report of the incident, Kleinwaks Decl. Ex. D at 184, from use in its case-in-chief. *But see Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002) ("Although a statement, taken in violation of *Miranda*, may not be used substantively in the prosecution's case-in-chief, such a statement, if voluntary, may be used for impeachment should the Defendant testify inconsistently").

To avoid any doubt, however, the government has confirmed with defense counsel that Defendant's motion is limited only to Defendant's statements made on March 5, 2019 while under arrest, and does not seek to suppress the recorded statement made by Defendant on June 4, 2019, when he was interviewed by EPAPD Detective Weigand about the Glock switch found in his possession. Kleinwaks Decl., Ex. N at 30. Defendant made this recorded statement after receiving *Miranda*

1   warnings.  *Id.*  The government reserves the right to oppose exclusion of the June 4, 2019 statement if

2   challenged.

3   **IV.    CONCLUSION**

4           For the foregoing reasons, the Court should deny Defendant's Motion to Suppress the physical

5   evidence found on Defendant because the entry to the residence, arrest, and search did not violate

6   Defendant's Fourth Amendment rights.  The government does not object to the limited exclusion of

7   Defendant's statements made while under arrest on March 5, 2019.

8

9   DATED:   November 19, 2020                          Respectfully submitted,

10                                                       DAVID L. ANDERSON
                                                         United States Attorney
11

12                                                          __/s/ Jason Kleinwaks_____
                                                         JASON KLEINWAKS
13                                                       Assistant United States Attorney

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28