UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAIME AVINA BARAJAS,<br><br>Defendant. | Case No. 19-cr-00562-WHO-1<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 34 |

Defendant James Avina Barajas is charged with violating 18 U.S.C. § 922(o), possession of a machinegun, and 26 U.S.C. §§ 5861(d) and (2), possession of unregistered firearm. He moves for an order suppressing all fruits of the warrantless entry of his residence and the warrantless searches and seizures that took place on March 5, 2019. He also seeks suppression of the statements he made in response to the officers' questions during his March 5, 2019 arrest.

The government does not object to exclusion of the March 5, 2019 statements from its case-in-chief. Barajas's motion to suppress these limited statements is GRANTED.[1] As set forth below, I find that the officers had cause to enter the residence without a warrant and arrest Barajas for misdemeanor vandalism in violation of California Penal Code section 594. Barajas's motion to suppress on those grounds is DENIED. However, I find that the officers, who subsequently decided not to carry through with the arrest and released Barajas, lacked probable cause to seize the bullets and unidentified gun piece found during the search incident to arrest because the incriminating character of those items was not "immediately apparent" at the time of seizure. The

---

[1] Barajas's motion is limited only to statements he made on March 5, 2019 while under arrest, and does not seek to suppress the recorded statement made by him on June 4, 2019, when he was interviewed by detectives about the Glock switch found in his possession.

unidentified gun piece was later identified as a Glock switch when officers consulted with an Alcohol, Tobacco, and Firearms ("ATF") agent.  Barajas's motion to suppress based on an unconstitutional seizure is GRANTED.

**BACKGROUND**

On March 5, 2019, at approximately 5:00 p.m., Barajas's mother called the East Palo Alto police to report that Barajas had left their apartment in a distressed state and may have taken pills. *See* Declaration of Jason Kleinwaks in Support of the United States' Opposition to Defendant's Motion to Suppress ("Kleinwaks Decl."), Ex. A (March 5, 2019 Call Translation).  She was concerned that he might hurt himself because he was upset that his girlfriend had broken up with him.  *Id.* at 219–20.  In light of the call, dispatch relayed that a welfare check was requested for Barajas.  *Id.*, Ex. B (Condensed Radio Recording – 1702 Incident) at 0:21.

Officer Andrew Wong was able to reach Barajas over the phone and speak with him.  *See* Declaration of Angela Chuang in Support of Defendant's Motion to Suppress ("Chuang Decl.") [Dkt. No. 35], Ex. A (Wong Police Report) at 181.  Upon learning that Wong was a police officer, Barajas stated that he doesn't "talk to fuckin' pigs" and promptly hung up.  *Id.*  Wong made about three more calls to Barajas, but each time Barajas hung up shortly after answering the phone.  *Id.*; *see* Kleinwaks Decl., Exs. E–H (audio recording of calls between Wong and Barajas).

Dispatch called Barajas's mother to inform her that Barajas was answering his phone but was "being aggressive and acting rudely."  March 5, 2019 Call Translation at 224.  Barajas's mother told dispatch that Barajas's girlfriend was not answering her phone because Barajas took it, that a female friend, Maria, had taken his car keys from him, and that Barajas was now texting Maria with his girlfriend's phone.  *Id.* at 224–25.  Barajas's mother believed that Barajas may be heading to Maria's residence to get his keys back.  *Id.* at 225.  This information was relayed to officers in the field and Barajas was eventually added to the missing persons system.  *See* Kleinwaks Decl., Ex. C (CAD Report) at 197 – 98; Wong Police Report at 181.

Several hours later, at approximately 9:30 p.m., Barajas's brother called and told dispatch that Barajas had taken pills and was acting "really crazy."  Kleinwaks Decl., Ex. I (March 5, 2019 Call – 2136) at 0:11–0:17.  He said that Barajas was at the family home, was "breaking a bunch of

2

things," and was being "very violent." *Id.* at 0:17–0:22. He said that Barajas told him he had taken around 20 pills, which the brother thought were Xanax. *Id.* at 1:58–2:10. The brother also told dispatch that Barajas's girlfriend broke up with him the prior night and he was "going crazy," reportedly calling his girlfriend a "bunch of names" and had been "pushing her around" the previous night. *Id.* at 3:49–4:10.

Barajas's brother informed dispatch that there were two women still at the home who had texted him and told him that they could not control Barajas. *Id.* at 1:17–1:32. He said that the two women had called him earlier crying, saying that Barajas had broken the TV, was throwing things around, and was threatening to keep breaking things unless the women gave him his car keys. *Id.* at 3:00–3:27. He indicated that the women had called him within the past four or five minutes and that one of the women in the apartment with Barajas was named "Maria." 3:27–3:37; 4:18–4:27. He provided dispatch with Maria's number. *Id.* at 4:40–4:50.

Dispatch attempted to contact Maria. A woman answered the phone, confirming that she was Maria, but then indicated that she did not know Barajas's brother and that she did not live in East Palo Alto. *See* Kleinwaks Decl., Ex. J (March 5, 2019 Call – 2141). Dispatch thought she had the wrong number and called Barajas's brother back to report the error. *Id.*, Ex. K (March 5, 2019 Call – 2143) at 0:10–0:33. Barajas's brother explained that he had provided the number that Maria had used to call him, and stated that Maria was "probably just covering" for Barajas and that she sounded "really scared" when she had called him earlier. *Id.* at 0:40–1:09. He also said that he could try texting Maria, but he did not know if she would answer after the call with dispatch. *Id.* at 1:15–1:33. As these events were unfolding, dispatch was relaying the critical information that Barajas's brother had provided to the officers in the field who were responding to the call. *See* Kleinwaks Decl., Ex. L (Condensed Radio – 2136 Call).

With the information from dispatch at hand, officers of the East Palo Alto Police Department, including Angel Sanchez and Paul Norris, responded to the call from Barajas's brother. Declaration of East Palo Alto Police Department Patrol Sergeant Angel Sanchez ("Sanchez Decl.") [Dkt. No. 39-1] ¶ 6. The officers approached the reported apartment and knocked on the door. *Id.* ¶ 7. The parties dispute who answered the door and what Barajas's

3

1   demeanor was at this point.  Barajas contends that both he and Maria Guzman went to the
2   doorway and that by this time he was calm and composed.  Declaration of Maria Guzman in
3   Support of Defendant's Motion to Suppress ("Guzman Decl.") [Dkt. No. 34-2] ¶ 3.  In his report,
4   Sanchez states that Barajas appeared agitated that the officers were present and that neither of the
5   two females who were reportedly present inside that apartment were visible.  Chuang Decl., Ex. C
6   (Sanchez Police Report) at 184; Sanchez Decl. ¶ 7.  When Barajas tried to shut the door on the
7   officers, Norris prevented the door from closing with his hand.  Sanchez Report at 184; Sanchez
8   Decl. ¶ 8.  Sanchez contends that he did not see Guzman until he was inside.  Sanchez Report at
9   184

10   Once inside, the officers could see a broken TV on the floor.  Sanchez Police Report at
11   184.  They ordered Barajas and Guzman to sit on the couch.  Guzman Decl. ¶ 6.  Barajas told the
12   officers that he had not taken any Xanax pills and that he was just upset with his family.  Sanchez
13   Police Report at 184.  Sanchez then called Barajas's father.  Guzman claims that she was within
14   earshot and heard Sanchez tell Barajas' father that he could not arrest Barajas because he had not
15   committed any crime and was not on probation or parole.  Guzman Decl. ¶ 6.  Sanchez said that he
16   could arrest Barajas only if Barajas's father wanted him arrested for vandalism for breaking the
17   TV.  *Id.*  In his report, Sanchez states that he told Barajas that he could place his son "under
18   citizens [sic] arrest for vandalism if he wished," and claims that Barajas's father agreed and that
19   the officers placed Barajas under citizen's arrest for vandalism.  Sanchez Decl. ¶ 11; Sanchez
20   Police Report at 184.  Both Guzman and Barajas's father attest that Barajas's father told the
21   officer he did not want to press charges and that he did not tell the officer to arrest his son.  *See*
22   Guzman Decl. ¶ 7; Declaration of Jose Avina in Support of Defendant's Motion to Suppress
23   ("Avina Decl.") ¶¶ 5, 8.6.

24   Sanchez handcuffed Barajas and took him outside to a police car.  Sanchez Police Report
25   at 184.  Guzman also went outside and witnessed the subsequent search of Barajas's person and
26   pockets.  Guzman Decl. ¶ 8.  Sanchez found bullets—some .223 caliber rounds and one .40 caliber
27   round—in Barajas's front right pocket.  Sanchez Police Report at 184.  Sanchez asked him why he
28   had the ammunition and claims that Barajas responded that it was for target shooting.  *Id.*  Sanchez

4

1    then found a "black metal semi-square gun piece" in Barajas's front left pocket. *Id.* Sanchez

2    recognized the "Glock" logo on the piece of metal because his "department issues Officers Glock

3    handguns as our department firearm," but did not know what it was or "where it would fit on the

4    gun." *Id.*; Sanchez Decl. ¶ 12. He asked Barajas what it was, and Barajas said it was a gun piece

5    belonging to his uncle. Sanchez Police Report at 184.

6        After Sanchez searched Barajas, the officers subsequently released him and did not follow

7    through on the arrest. Sanchez Police Report at 184–85. Sanchez states that they released Barajas

8    because his father "had a change of heart" about pressing charges. *Id.* at 184; Sanchez Decl. ¶ 13.

9    Despite the lack of a completed formal arrest, the officers still seized and kept the bullets and the

10   metal gun piece. Chuang Decl., Ex. D (Norris Police Report) at 182 (indicating the bullets were

11   confiscated to be destroyed).

12       The East Palo Alto Police Department maintained possession of the bullets and the gun

13   piece. On March 7, 2019, the Redwood City Police Department asked to examine the things that

14   had been seized from Barajas as part of a different investigation. Norris Police Report at 183.

15   "Upon seeing the unknown firearms part," Redwood City detectives suspected that it may be an

16   illegal conversion device and communicated that to officer Robert Weigand of the East Palo Alto

17   Police Department. Chuang Decl., Ex. E (Weigand Police Report) at 28–29. Weigand then

18   consulted with an ATF agent, who identified the gun piece as a Glock switch. *Id.* Barajas was

19   subsequently charged in the instant matter with possession of a machine gun and possession of an

20   unregistered firearm.

21   **LEGAL STANDARD**

22       The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons,

23   houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

24   Searches conducted without a warrant "are per se unreasonable under the Fourth Amendment—

25   subject only to a few specifically established and well-delineated exceptions." *Katz v. United*

26   *States*, 389 U.S. 347, 357 (1967) (footnote omitted). The government bears the burden of proving

27   that a warrantless search or seizure falls within an exception to the warrant requirement. *United*

28   *States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001). Reasonableness, which is the "touchstone"

of the Fourth Amendment, is "measured in objective terms by examining the totality of the circumstances," which involves a fact-specific inquiry. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

## DISCUSSION

There is no dispute that Barajas has standing to challenge the entry, search, and seizure at issue in this case because he had a reasonable expectation of privacy in his person and in the apartment. Further, there is no dispute that the officers' entry and arrest was without a warrant, meaning that it was presumptively unlawful and that the government has the burden of establishing otherwise. *See United States v. Job*, 871 F.3d 852, 863 (9th Cir. 2017). This motion comes down to three questions: (i) whether the officers' entry into the apartment was proper under the emergency aid exception, (ii) whether the officers had probable cause to subsequently arrest Barajas for vandalism; and (iii) even if the warrantless entry and arrest were lawful, whether the officers had probable cause to seize the bullets and the alleged Glock switch found during the search incident to arrest. *See* Defendant's Motion to Suppress ("Mot.") [Dkt. No. 34].

### I.     ENTRY INTO THE RESIDENCE

Under the Fourth Amendment, searches and seizure inside a home without a warrant are presumptively unconstitutional. *Payton v. New York*, 445 U.S. 573, 585 (1980). Officers can overcome this presumption either with "probable cause and exigent circumstances or an emergency sufficient to justify the entry." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014), *cert. denied,* 135 S. Ct. 1401 (2015); *see also U.S. v. Struckman*, 603 F. 3d 731, 738 (9th Cir. 2010). Under the emergency aid exception, officers may enter a residence without a warrant "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009).

To assess whether the government has satisfied the emergency aid exception, the Ninth Circuit uses "a two-pronged test that asks whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). Under that test "if law enforcement, while responding to an emergency, discovers

evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would be found." *Id.* (internal citation omitted).

Application of the emergency aid exception "does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises," but "requires only an objectively reasonable basis for believing that a person within [the residence] is in need of immediate aid." *Fisher*, 558 U.S. at 47 (citations and internal quotation marks omitted). A court must "assess officers' actions 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Sandoval*, 756 F.3d at 1163 (quoting *Ryburn v. Huff*, 565 U.S. 469, 477 (2012)). In this context, an action is reasonable "regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (internal citation omitted). Courts have "eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry, and looked to the totality of the circumstances." *Snipe*, 515 F.3d at 953.

The government has met its burden to show that the officers' entry into the apartment was lawful under the emergency aid exception. The facts justifying entry because of concern for the two females in the apartment and for Barajas's mental condition are borne out in call recordings and transcripts, CAD reports, and radio broadcast recordings, as discussed below.

On March 5, 2019, at approximately 5:00 p.m., Barajas's mother called the police to report that her son, Barajas, had left their apartment in a distressed state and may have taken pills. March 5, 2019 Call Translation at 211. When asked by the dispatcher if Barajas told her that he wanted to hurt himself, she confirmed "Yes, he told [his girlfriend] that he wanted to hurt himself. He wanted to take the pills because he wanted to die." *Id.* at 213. She further indicated that Barajas's behavior was because his girlfriend no longer wanted to live with him in the house. *Id.*

Later that evening, at approximately 9:30 p.m., Barajas's brother called the police to report that Barajas was breaking things in the family's apartment, including a TV. Chuang Decl., Ex. B (CAD Report) at 187. He stated that Barajas had claimed to have taken around 20 Xanax pills, was acting "really crazy," and was being "very violent." March 5, 2019 Call – 2136 at 0:11–0:23, 0:57–1:03, 2:00–2:12. Barajas's brother further told dispatch that two females were present at the

7

residence who couldn't "control him" and had indicated that they were crying and scared. *Id.* at 3:03–3:31. He elaborated that Barajas had called his girlfriend a bunch of names and was "pushing her around" the previous evening. *Id.* at 3:55–4:08.

Dispatch relayed the most critical information received from Barajas's brother to the officers responding to the call, including that Barajas was identified as the individual involved in the earlier incident, that Barajas may have taken a large quantity of Xanax, was breaking things in the apartment, and that there were potentially two females, one of who was identified as "Maria," in the residence with Barajas. Condensed Radio – 2136 Call at 0:09–1:21, 4:31–4:40. Dispatch also relayed that the reporting party had spoken with one of the women with in the past five minutes. *Id.* at 1:21–1:40.

Barajas argues that his interaction with the officers at the door dissipated any reason to believe that emergency aid was required. Mot. 8. Guzman testifies that she opened the door along with Barajas, and that by that time "he had calmed down and was composed." Guzman Decl. ¶ 3. Sanchez claims that Barajas "appeared agitated that the police were at his apartment," and opened the door only partially, blocking their view of the inside of the apartment. Sanchez Decl. ¶ 7. He contends that he could not determine whether the reported female occupants were safe from outside the apartment in the short period before Barajas attempted to shut the door on them, nor could the officers determine whether Barajas himself needed medical assistance or should be placed on a 5150 mental hold. *Id.* ¶¶ 7, 8. According to his report, Sanchez did not make contact with Guzman until he and Norris entered the apartment. Sanchez Police Report at 184.

Even if Barajas had calmed down and was composed when the officers arrived, that does not dissipate the officers' objectively reasonable basis for believing that either Barajas or one of the occupants in the residence may have been in need of immediate aid, given the information they had about the preceding events. Moreover, even if the officers had seen Guzman at the door, they were informed that there were two females in the apartment, not one. Guzman concedes, "I do not believe that the officers could see into the apartment because we were in the way," so even if the officers could confirm her well-being, they could not do the same with respect to the other female reportedly inside the apartment. Guzman Decl. ¶ 3. The officers could also reasonably conclude

8

1  that, given the information provided, Guzman may have been "less than forthcoming" about any
2  danger while positioned next to Barajas. *See United States v. Brooks*, 367 F.3d 1128, 1136 (2004)
3  (citing *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)).

4        Barajas argues that the facts underlying emergency aid cases cited by the government
5  demonstrate what is lacking in this case—any specific facts establishing that a person was being
6  physically harmed or was in immediate danger of such harm. Defendant's Reply in Support of
7  Motion to Suppress ("Reply") [Dkt. No. 45] 3; *see Fisher*, 558 U.S. at 45 (officers saw blood on
8  the hood of a car and on clothes inside of it, three broken windows, and witnessed defendant
9  screaming and throwing things); *Brigham City*, 547 U.S. at 407 (through a window, officers saw a
10  juvenile punch another person in the face and the punched person spit blood into a sink, then saw
11  other adults in the room struggling to restrain the juvenile); *United States v. Black*, 482 F.3d 1035,
12  1039 (9th Cir. 2007) (defendant's ex-girlfriend called 911 to report that he had beaten her up and
13  that he had a gun); *Brooks*, 367 F.3d at 1134 (officers responded to a call from a neighboring hotel
14  room where caller reported hearing sounds of a woman being beaten). The officers here did not
15  see blood in plain view or witness an ongoing physical assault, nor did they have information
16  alleging that he was beating anyone or threatening to do so.

17        But officers need not "witness ongoing violence before responding to an emergency."
18  *Snipe*, 515 F.3d at 952 n.6. The Ninth Circuit has found that such a requirement would be
19  inconsistent "not only with the purposes underlying the emergency doctrine but also with *Brigham*
20  *City*'s express statement that police officers do *not* have to wait for violence before acting." *Id.*
21  (citing *Brigham City*, 126 S. Ct. at 1949 ("The role of a peace officer includes preventing violence
22  and restoring order, not simply rendering first aid to casualties.")); *see also United States v.*
23  *Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) ("We do not think that the police must stand outside an
24  apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear
25  screams."). Indeed, "[o]fficers do not need ironclad proof of a likely serious, life-threatening
26  injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 49. Given the nature of such
27  incidents and the information at hand, I find that the officers had an objectively reasonable basis
28  for believing that either Barajas or one of the occupants in the apartment might be in need of

immediate aid.

*Snipe* also requires that the "scope and manner" of the entry justified by exigent circumstances be "reasonable to meet the need." *Snipe*, 515 F.3d at 952. Barajas makes no argument with respect to the second prong; he only argues that "the government has not sufficiently established that the first requirement was met." Reply 2. Nothing in the evidence before me indicates that the "scope and manner" of the officers' entry was unreasonable to meet the need that they confronted. The officer did not, for example, look in drawers or under couch cushions once inside the apartment. Instead, as further discussed below, once inside the apartment, the officers' presence was mostly limited to the living room area, where they saw the broken TV.

The officers had cause to enter the residence without a warrant under the emergency aid exception. Barajas's motion to suppress on this ground is DENIED.[2]

## II. ARREST

Barajas was arrested by officers without a warrant in his home for the offense of vandalism related to a broken TV. Barajas argues that the arrest violated his Fourth Amendment rights.

Sanchez claims that he was effectuating a citizen's arrest on behalf of Barajas's father, who he had called on the telephone after seeing the broken TV inside the residence. Sanchez Police Report at 184. That is contrary to what Barajas's father and Guzman claim. Avina Decl. ¶ 5, 8 ("The officers asked if I wanted to press charges against Jamie for breaking the television. I told the officer I did not want to press charges against my son."; "At no time did I ask officers to arrest Jamie."); Guzman Decl. ¶ 7.

The government argues that I need not reach the question of whether Barajas's father did in fact authorize the arrest because the officers had probable cause to arrest Barajas for either

---

[2] Given my ruling, I need not address the government's alternative argument that even if the entry was unconstitutional, the exclusionary rule should not apply because the officers acted in good faith. I note, however, that good faith only saves unconstitutional police conduct from the remedy of suppression in limited circumstances, such as when the police rely in good faith on what appears to be a valid search warrant, *United States v. Leon*, 468 U.S. 897 (1984), or a record of an active warrant, *Herring v. United States*, 555 U.S. 135 (2009). No such circumstances are present here.

felony or misdemeanor vandalism under California Penal Code section 594. United States' Opposition to Defendant's Motion to Suppress ("Oppo.") [Dkt. No. 39] 14. The case law "make[s] clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause" and that the officer's "subjective reasons for making the arrest need not the be criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *United States v. Ramirez*, 473 F.3d 1026, 1030–31 (9th Cir. 2007). Accordingly, the government argues, the officers' asserted rationale or basis for an arrest or seizure does not foreclose it from later justifying that arrest or seizure by proving probable cause. *See Ramirez*, 473 F.3d at 1031; *Florida v. Royer*, 460 U.S. 491, 507 (1983). The threshold question regarding the constitutionality of Barajas' arrest inside his home is whether the officers had probable cause to arrest him for felony or misdemeanor vandalism.

### A. Felony Vandalism

An individual is guilty of felony vandalism under California Penal Code section 594(b)(1) when he or she maliciously damages or destroys "any real or personal property not his or her own" and the damage or destruction is four hundred dollars ($400) or more. Cal. Penal Code § 594(b)(1). California Penal Code section 836(a)(3) authorizes officers to make arrests when the officer "has probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed." Cal. Penal Code § 836(a)(3). In this inquiry, "[p]robable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). "Alternatively, [the Ninth Circuit] has defined probable cause as follows: when 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'" *Id.* (quoting *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986)).

The government contends that the officers had probable cause to believe that Barajas destroyed a TV exceeding $400 in value that did not belong to him, and accordingly had committed a felony. Oppo. 15. The officers were informed by dispatch prior to their arrival that

the reporting party, Barajas's brother, had advised that Barajas was breaking things in the apartment and specifically mentioned the TV. Sanchez Decl. ¶ 6; Kleinwaks Decl., Ex. M (CAD Report) at 188; March 5, 2019 Call – 2136 at 3:03–3:31. When the officers made entry to the apartment, they observed a broken flat screen TV, approximately 40 to 50 inches in size, laying on the floor. Sanchez Decl. ¶ 10; Sanchez Police Report at 184. Barajas stated that he had broken the TV, and when the officers spoke to Barajas's father, he confirmed that the TV belonged to him. Sanchez Decl. ¶¶ 10–11; Sanchez Police Report at 184.

Barajas argues that the officers did not have probable cause to believe that the damage amounted to more than $400, as required for felony vandalism. Mot. 10. I agree. As Barajas asserts in his reply brief, the reality is that flat screen TVs of this size today regularly retail for less than $400. Reply 5; *see* Declaration of Michael Portman ("Portman Decl.") [Dkt. No. 46]; *see id.*, Ex. A (web archiving service snapshot of Best Buy website as it existed in March 2019 shows that 43-inch flat screen TVs cost around $250). It is doubtful that a reasonably prudent person would have concluded that the broken TV was worth more than $400; the government fails to demonstrate a sufficient objective basis to support a contrary conclusion (such as that the TV was a particularly expensive brand).

In Sanchez's version of his conversation with Barajas's father, Sanchez explained that he could make a citizen's arrest on Barajas's father's behalf. Sanchez Decl. ¶ 11. His statement supports the finding that he lacked an objective basis upon which to conclude that a felony had occurred. If there were objective facts establishing probable cause that a felony had been committed, the officers could have arrested Barajas without his father's authorization and there would be no need for a citizen's arrest.

Given the totality of circumstances, I find that the officers did not have probable cause to believe that Barajas committed felony vandalism.

### B. Misdemeanor Vandalism

Barajas argues that the officers could not arrest him for misdemeanor vandalism because California Penal Code section 836(a) authorizes an officer to make a misdemeanor arrest only where the misdemeanor is committed in the officer's presence. Mot. 10. The government argues

that this "in presence" restriction on arrest authority is only a matter of state law rather than a Fourth Amendment issue. Oppo. 15–16.

The Ninth Circuit has unequivocally held that "[t]he requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment." *Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990); *United States v. Becerra-Garcia*, 397 F.3d 1167, 1173 (9th Cir. 2005) (noting the "well-established proposition that an arrest in violation of state law may still be constitutionally reasonable"). Suppression is not appropriate where "the arrest rules that the officers violated were those of state law alone, and . . . it is not the province of the Fourth Amendment to enforce state law." *Virginia v. Moore*, 553 U.S. 164, 178 (2008).

Barajas points out that the Ninth Circuit's opinion in *Barry* relied primarily on a Fourth Circuit case from 1974, which in turn based its holding on the reasoning that the Supreme Court had not held that common-law arrest rules carried constitutional force. Reply 6; *see Street. v. Surdyka*, 492 F.2d 368, 372 (4th Cir. 1974). But, he argues, neither the Fourth Circuit in *Street* nor the Ninth Circuit in *Barry* had the benefit of guidance from the Supreme Court's subsequent opinion in *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), which strongly suggests that certain common-law arrest rules are embedded in the Fourth Amendment.

In *Atwater*, the Supreme Court held that "[i]n reading the [Fourth] Amendment, we are guided by 'the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing,' since 'an examination of the common-law understanding of an officer's authority to arrest sheds light on the obviously relevant, if not entirely dispositive, consideration of what the Framers of the Amendment might have thought to be reasonable.'" *Atwater*, 532 U.S. at 326 (internal citations omitted). The Court went through a lengthy historical analysis of common-law arrest rules to demonstrate that there was no clearly established common law rule limiting misdemeanor arrests to only those offenses that involved a breach of the peace. *Id.* at 326–45. The Court ultimately held that there is no breach of the peace requirement for such arrests. *Id.* at 45.

Notably, the "in the presence" requirement was not an issue in *Atwater*. The Court left

open the question of whether an officer may make a constitutionally-sound arrest upon probable cause that a misdemeanor was committed outside of his presence. *Atwater*, 532 U.S at 340 n. 11 ("We need not and thus do not, speculate whether the Fourth Amendment entails an 'in the presence' requirement for purposes of misdemeanor arrests."). Nonetheless, Barajas argues that the Supreme Court's extensive historical analysis is still significant because there appeared to be no such ambiguity regarding the "in the presence" requirement. Rather, the historical sources described in *Atwater* as well as state statutes listed in the opinion's Appendix overwhelmingly include an "in the presence" requirement for misdemeanor arrests. Thus, he contends that this supports the idea that the "in the presence" rule in California Penal Code section 836 is not merely a matter of state arrest law, but rather is best understood as codification of a historically-based common-law rule that was incorporated into the Fourth Amendment.

While Barajas's argument is interesting, it has not been adopted by the Supreme Court or the Ninth Circuit. The Ninth Circuit has not reversed its position in *Barry* following *Atwater*. *See Hall v. Hughes*, 232 F. App'x 683, 684–85 (9th Cir. 2007) ("This court has held that the violation of the Washington statute precluding arrest for a misdemeanor unless the officer observes the crime does not deprive a citizen of a constitutional right.") (citing *Alford v. Haner*, 446 F.3d 935, 937 n.2 (9th Cir.2006) and *Atwater*, 532 U.S. at 354); *see also United States v. McNeill*, 484 F.3d 301, 311 (4th Cir. 2007) (citing cases from multiple circuits, including *Barry*, and noting that "[s]everal other circuits have held that the Fourth Amendment contains no 'in the presence' requirement, and none have reversed their position in the wake of *Atwater*[.]").

The Sixth Circuit's recent opinion in *Graves v. Mahoning Cty.*, 821 F.3d 772 (6th Cir. 2016) appears to be the most in depth analysis on this issue to date. The Sixth Circuit held that while Supreme Court has never determined whether a misdemeanor arrest for acts committed outside the presence of the police officers requires a warrant, "it's not an open question at our court," and "[o]ther circuits agree with our approach." *Id.* at 778–79 (citing cases, including *Barry*). "All the while, though, no court has devoted much more than a line or two to this issue." *Id.* at 779. The Sixth Circuit then went on to note the "sound reasons for our court's position, as all this company suggest," while, at the same time, emphasizing that "there are valid competing

14

arguments that deserve to be addressed at some point." *Id.* ("The common law, most sources say, prohibited an officer from "mak[ing] a [warrantless] arrest for a misdemeanor [unless] the crime was committed in his presence."). It also noted that "[s]ome state courts, following this logic, have constitutionalized the common law rule," and "[s]ome commentators have urged modern courts to do the same." *Id.* at 780 (citing state cases, notably none from California); *see* William A. Schroeder, Warrantless Misdemeanor Arrests and the Fourth Amendment, 58 Mo. L. Rev. 771, 853 (1993) (concluding that "[a]t common law, no person could be arrested for a misdemeanor unless the offense involved a breach of the peace and was committed in the presence of the person making the arrest," and that "some version of the common law rule should be constitutionalized"). The Sixth Circuit concluded with the following:

> With sound arguments on each side, it's no wonder that the Court has left the question open, even while deciding related questions about warrantless arrests. *See, e.g.*, *Moore*, 553 U.S. at 168–73, 128 S. Ct. 1598; *Atwater*, 532 U.S. at 341 n. 11, 121 S. Ct. 1536; *Watson*, 423 U.S. at 414–24, 96 S. Ct. 820. And it's no wonder that some judges have flagged the issue. *See, e.g.*, *Veatch*, 627 F.3d at 1258–59 (Colloton, J.); *Gramenos*, 797 F.2d at 441 (Easterbrook, J.). Today, however, is not the day to address it.

*Id.* at 780.

Whether California law permits warrantless arrests for misdemeanors committed outside of an officer's presence is immaterial here. Under federal law, as it stands now, warrantless arrests based upon probable cause can be legal even if the alleged crime was committed outside of the officer's presence. *See Barry*, 902 F.2d at 772. As discussed above, while the officers did not have probable cause to arrest Barajas for felony vandalism given the value of the broken TV, they certainly had probable cause to believe that Barajas had committed misdemeanor vandalism under California Penal Code section 594 and could arrest him. Because Barajas's arrest did not violate his Fourth Amendment rights, his motion to suppress on this ground is DENIED.

### III.    SEIZURE OF EVIDENCE

Notwithstanding the above conclusions, Barajas argues that the government has not provided any justification for the officers to seize the bullets and alleged Glock switch. Mot. 11. Even though the items were discovered during a lawful search incident to arrest, the officers

15

decided not to follow through with the arrest and released him at the scene. Accordingly, the constitutionality of the seizure of the items is an inquiry distinct from the question of whether the preceding search was itself constitutional. *Warden v. Hayden*, 387 U.S. 294, 307 (1967).

Case law establishes a separate probable cause standard for seizure of items found where officers have a lawful right of access to the discovery of the items. The cases usually arise in the context of an officer who, while executing a valid search warrant, inadvertently discovers an item in "plain view." *Horton v. California*, 496 U.S. 128, 136 (1990). For warrantless seizure of that item to be justified, "its incriminating character must also be 'immediately apparent.'" *Id.* (internal citations omitted).

Barajas points out that the specific scenario in this case is not typically confronted because the arrest is usually carried out and the items seized are kept as part of the booking process. Here, however, the officers decided not to carry through with the arrest but still kept the items. He contends that the same "immediately apparent" test applies in this situation because, even though the officer's search incident to arrest was valid, once the officers decided not to book him, their continued seizure of the items that were not "immediately apparent" to be of a criminal nature violated the Fourth Amendment.

The government does not dispute that the "immediately apparent" test applies in this situation. United States' Sur-Reply in Opposition to Defendant's Motion to Suppress ("Sur-Reply") [Dkt. No. 49] 1. Seizure of property under the "immediately apparent" test requires probable cause, which is "a flexible, common-sense standard" that "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' . . . that certain items may be contraband or stolen property or useful as evidence of a crime." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)); *see United States v. Borowy*, 595 F.3d 1045, 1049 (9th Cir. 2010).

In *Brown*, the seizing officer stopped an automobile as part of a routine license check and inadvertently discovered a knotted party balloon suspiciously placed between the driver's fingers. *Brown*, 460 U.S. at 733. The Supreme Court held that the criminal nature of the seized object was "immediately apparent" in light of the particular officer's experience with the wide use of such

1  balloons to carry narcotics. *Id.* at 742–43. It explained that "[t]he seizure of property in plain
2  view involves no invasion of privacy and *is presumptively reasonable, assuming that there is*
3  *probable cause to associate the property with criminal activity*." *Id.* at 741–42 (emphasis in
4  original) (quoting *Payton*, 445 U.S. at 587).

5      Accordingly, I must "apply the standard that evidence in plain view may be seized when
6  the executing officers have 'probable cause' to believe that a nexus existed between the viewed
7  item and criminal activity." *United States v. Washington*, 797 F.2d 1461, 1469 (9th Cir. 1986)
8  (citing *United States v. Szymkowiak*, 727 F.2d 95, 97 (6th Cir. 1984)). "[A] reviewing court
9  should be duly mindful of the executing officers' particular, subjective training and experiences."
10 *Szymkowiak*, 727 F.2d at 98 (citing *Brown*, 460 U.S. at 745 (Powell, J., concurring)). At the
11 hearing, the parties pointed to two Sixth Circuit as highly instructive – *United States v. Truitt*, 521
12 F.2d 1174, 1177 (6th Cir. 1975) and *United States v. Szymkowiak*, 727 F.2d 95, 98 (6th Cir. 1984).
13 Barajas argued that this case is analogous to *Szymkowiak*, and the government argued that this case
14 is analogous to *Truitt*.

15     In *Truitt*, the Sixth Circuit upheld the seizure of evidence where, while conducting a lawful
16 search, the executing officers inadvertently discovered a sawed-off shotgun. *Truitt*, 521 F.2d at
17 1175. The court determined that the officers could reasonably derive probable cause to believe
18 that the evidence was incriminating from the very moment they "first discovered" the object. *Id.*
19 at 1176–77. The officer's knowledge of the incriminating nature of the shotgun in *Truitt*, thus,
20 was "immediate," and the criminal nature of the possession of an "intrinsically" suspicious
21 shotgun was "apparent" from mere observation of the object. *Id.* at 1177.

22     In *Szymkowiak*, the Sixth Circuit suppressed evidence based on an unconstitutional seizure
23 where "[f]rom the 'facts available' to the [seizing] officers," they "could not determine whether
24 they had discovered evidence of a criminal nature." *Szymkowiak*, 727 F.2d at 99. While executing
25 a search warrant for jewelry and a TV, officers discovered and seized two automatic weapons. *Id.*
26 at 96. At the time of seizure, they "could not determine whether the guns seized" were automatic
27 and asked an ATF agent to examine them. *Id.* Thirty minutes later, the ATF agent arrived and
28 informed them that he "could not clearly determine" whether the guns were automatic without

disassembling them. *Id.* On these facts, the Sixth Circuit held that seizure of the guns was unlawful because "[t]he incriminating nature . . . was at no time 'apparent' to the seizing officers or agents." *Id.* at 98. The court explained that "even if probable cause of criminality were 'apparent' to the ATF expert, such probable cause clearly was not 'immediately' so. The record in this case is clear that the executing officers who discovered the weapon could not '*at the time*' of discovery determine whether its possession was unlawful." *Id.* at 99 (emphasis in original).

The circumstances in this case are more similar to *Szymkowiak*. Sanchez did not know what the alleged Glock switch was at the time of seizure, as reflected in both his police report and recent declaration. In his report, he wrote that he "found a black metal semi-square gun piece in [Barajas's] left front pants pocket." Sanchez Police Report at 184. He "recognized the 'Glock' name printed on one end as a gun manufacturer," noting that "[o]ur department issues Officers Glock handguns as our department firearm." *Id.* However, he reported that "[t]he piece Avina Barajas was in possession of *did not look familiar to me, and I did not know where it would fit on the gun*." (emphasis added). He proceeded to ask Barajas what it was and Barajas said it's a gun piece belonging to his uncle. *Id.* Similarly, in his declaration, Sanchez testifies that he "located a small semi-square piece with 'Glock' written on it in Barajas's pocket," and while he is "familiar with Glock firearms because the East Palo Alto Police Department uses Glock firearms as the department's duty-issued firearm," and "recognized this as a firearms component generally," he "was not familiar with this particular piece, and asked Barajas what it was." Sanchez Decl. ¶ 12. Thus, the incriminating character was not "immediately apparent," there is no evidence that he was known to be a prohibited person at the time whose mere possession of such items would have been illegal, and the officers did not have probable cause to objectively link these particular items with any other crime.

It was not until two days later, on March 7, 2019, that the Redwood City Police Department asked to examine the seized items as part of a different investigation. Norris Police Report at 183. "Upon seeing the *unknown firearms part*," Redwood City detectives suspected that it might be an illegal conversion device and communicated that to the East Palo Alto Police Department. Weigand Police Report at 28 (emphasis added). Weigand then consulted with an

1  ATF agent, who identified the gun piece as a Glock switch. *Id.* at 28–29; *see* Second Declaration
2  of Jason Kleinwaks in Support of the United States' Opposition to Defendant's Motion to
3  Suppress [Dkt. No. 49-1], Ex. A (ATF Report of Technical Examination dated June 18, 2019)
4  (concluding that the Glock switch found in Barajas's possession is a part "designed and intended
5  solely and exclusively, for use in converting a weapon into a machinegun").

6  The government argues that a Glock switch, like the sawed-off shotgun in *Truitt*, is "not an
7  intrinsically innocent object" and the "possession of it is a serious crime, except under
8  extraordinary circumstances." *Truitt*, 521 F.2d at 1174. The problem with that analogy is that the
9  intrinsically criminal nature of the item found in *Truitt* was immediately apparent, as the executing
10 officers recognized it as a sawed-off shot gun at the time of seizure. By contrast, the executing
11 officers here did not recognize the item seized as a Glock switch at the time of seizure; its criminal
12 nature was not discovered until days later after an ATF agent examined it, similar to what
13 happened in *Szymkowiak*. Unlike *Truitt*, where the executing officers "could reasonably derive
14 probable cause to believe that the seized evidence was incriminating from *the very moment* they
15 'first discovered' the intrinsically' suspicious evidence," probable cause was neither "immediate"
16 nor "apparent" to the executing officers in this case. *Szymkowiak*, 727 F.2d at 98 (citing *Truitt*,
17 521 F.2d at 1176–77.) In *Szymkowiak*, the Sixth Circuit found that even if probable cause of
18 criminality were "'apparent to the ATF expert," who came on the scene within thirty minutes,
19 "such probable cause was not 'immediately' so." *Szymkowiak*, 727 F.2d at 99. The ATF expert's
20 identification of the Glock switch here was not immediate either.[3]

21 If officers were allowed to seize items not reasonably identified as contraband *at the time*
22 *of seizure*, this bootstrapping approach would vitiate the probable cause standard for seizures of
23 property. It would allow later-in-time investigation of an item to justify its prior seizure regardless
24 of whether the seizing officers at the time had probable cause to believe it was contraband or

---

[3] The government contends that Sanchez "did not recognize the Glock switch as any legitimate firearm component." Sur-Reply 2. To be clear, Sanchez could not determine if the Glock switch was a legitimate part or an illegitimate part of a firearm. He only "generally" recognized it as a firearm part, was familiar with the Glock logo as a firearms brand, but "was not familiar with this particular piece." Sanchez Decl. ¶ 12.

linked to criminal activity. The proper inquiry must focus on whether probable cause existed at the time of seizure, not at some time thereafter.

This does not mean that officers are required to know with certainty that something is contraband in order to seize it. But the government must still offer sufficient facts to establish probable cause of its criminal nature at the time of seizure. Those facts are not present here, where the seizing officers lacked the information and knowledge necessary to even tentatively identify the Glock switch as contraband.

Accordingly, even though Barajas's arrest was lawful and the search incident to arrest was lawful, the officers lacked probable cause to maintain possession of the items that they discovered during the search. Barajas's motion to suppress based on an unconstitutional seizure is GRANTED.

## CONCLUSION

Barajas's unopposed motion to suppress the statements he made on March 5, 2019 while under arrest is GRANTED. His motion is DENIED with respect to the warrantless entry and warrantless arrest and GRANTED with respect to the unlawful seizure of the bullets and unidentified gun piece, later identified as a Glock switch, found during the search incident to arrest. The status conference remains scheduled for February 11, 2021 at 1:30 p.m.

**IT IS SO ORDERED.**

Dated: February 4, 2021

William H. Orrick
United States District Judge